Second case for argument. Case number 24-3108 from the District of South Dakota, United States v. Marwan Hamdan. Ms. Carter? Good morning and may it please the court. My name is Anne Carter and I represent the appellant Marwan Hamdan. We are asking the court to reverse the order denying Mr. Hamdan's motion to suppress because officers illegally extended the traffic stop without reasonable suspicion. This case presents two questions. First, did the officers extend the traffic stop? And second, did they have reasonable suspicion to do so? We would submit that the district court erred in finding reasonable suspicion here. Looking to the totality of the circumstances, the officers did not have a particularized reason to think that crime was afoot this evening. The occupants of the car did not engage in any suspicious behavior that night. Let me ask this. Would you at least concede when the officer found the open container that at that point there was reasonable suspicion? Yes, Your Honor. Once the officer sees the open container, there's reasonable suspicion to search the car. We are looking to everything that happened between when the officers first approached the vehicle and when he sees that open container. So the trigger is the initial approach to the vehicle. You think it was improperly extended at that point? No, Your Honor. Not at that point. So can you highlight for me, Judge Grunder asked when it's cut off. I'm wondering when the problem starts. Yes, Your Honor. We believe there are two points at which the officers extended the stop. First, when the officer in the vehicle is asking the driver questions that are unrelated to the purpose of the traffic stop regarding her relationship, regarding marijuana, without any reason to think there's marijuana use. And then the second, and the point I would probably focus the most on, is the point at which the officers run a records search on an individual who is not in the vehicle and who has left for several minutes. There was an ID search on the three people in the car, including your client. When did the officer request the IDs and when did that happen? I'm just having trouble putting, I think we've got multiple cameras and different time stamps and when did that, what was going on with Officer Mayberry in the car when that, when those three IDs were turned over? There was maybe two turned over and one was turned over earlier. Yes, Your Honor. So at about 1230 and 59 seconds, so about 1231, Officer Mayberry in the car is beginning to ask the driver, Leslie, those questions that the magistrate does. At approximately the same time, Officer Leacraft outside the car receives those IDs. He radios them in to dispatch about 1231 and 56 seconds. That's when he starts. And it is after that point that he comes back to the car and he asks Officer Mayberry to use the car's computer to run a search on someone who's not there and who has left the scene. Has the ID search on the three come back yet? No, Your Honor. Dispatch didn't return those until Officer Leacraft was dumping the bottle of alcohol. Why wasn't the, I mean, I think we have cases, I'm thinking of the Ward case that's recent that says that you can prolong a traffic stop when you're searching, when you get consent essentially. You ask the three people in the car for their IDs. I don't know that they're entitled to, but in this case they gave them over. And then isn't the officer entitled to run those IDs since they've consented to an ID check? And doesn't, I'm just wondering, does that factor into your argument at all or do you think that doesn't apply? Your Honor, I don't think the officer needs consent to run the searches on the passengers. Well, he would need consent to get their IDs, right? I mean, and that, well, whether he needs it or not, he got it in this case, right? Yes, Your Honor. The court looks to whether the execution of the stop was reasonably diligent. And waiting for those records to come back under the circumstances of this case was not reasonably diligent. Well, I'm wondering about that because they knew who your client was, at least that's the evidence in the record. Yes, Your Honor. They had concerns about the location, all those other things that go into it, right? I mean, I know that goes into whether there was reasonable suspicion for the whole stop. But doesn't that go into, hey, we get a little extra time to check IDs and see who's here with this individual? Your Honor, I agree that the officers can run IDs, that they can search, they can find out who's there, who's hanging out. And Officer LeCraft recognizes my client and one of the backseat passengers. The cases still require that he execute the search with reasonable diligence. And at this point, if he wants to execute it with reasonable diligence, when he goes back to that car, he should be asking Officer Mayberry to run record searches in the car on those occupants. When was the record search requested by, was it Officer Mayberry? It was Officer LeCraft, right? The record search on the individual in the Jeep, Mr. Sheik. I'm thinking about the three. The three. So he begins radium dispatch about 1231-56. And that's the same time that these other questions start with Officer Mayberry, right? It's a little bit into after Officer Mayberry is talking to the driver and asking her those questions. Yes, Your Honor. What about the, so the cousin, I'm wondering about the cousin. So I think he admits that it is his cousin, and that is awfully suspicious. And by the way, we have a case that says that there's probably no First Amendment right to film police. It's not something you can arrest people over, but it's not a clearly established right. And so it seems to me that figuring out the connection between the weird guy who's coming by and filming the scene and the cousin is probably not an unlawful extension of the stop. Maybe you can make an argument about the questions he asked the driver, but it seems to me like that's pretty suspicious behavior. Your Honor, I would disagree that it's suspicious behavior. I do think that people have a right to observe the police. And the important point here is that he had left the scene. He had left the scene for several minutes. There's no indication that he had any intention of coming back. Doesn't he have a safety concern that somehow they were talking to each other and that that was just, I'm going to film it and then I'm going to figure out how I'm going to attack these officers? I mean, I'm just speaking from the viewpoint of somebody who's on the scene. Your Honor, I think any instinct that they would have to that doesn't arise to the level of more than a mere hunch. And to establish reasonable suspicion here, the officers have to have more than a mere hunch. With him having already left, they don't have any facts to indicate that he has an intention of coming back. Well, let me ask you this. Why isn't there reasonable suspicion from the beginning? So they're at a gas station that had a history of crime and gang activity. It was late at night. Nothing usually good happens after midnight. Both Hamdan and one of the passengers had a criminal history and were on parole. So he's associating with known felons or known criminals. He was a person of interest in a six-month-old shooting. Now, there's a dispute about that, but I get that. But it still creates suspicion. And Hamdan had gang tattoos and displayed gang signs in a video and in prison. To me, that sounds like reasonable suspicion. So, your Honor, we grouped these factors. You've identified the factors that the district court relied on very clearly. And so I think of these as kind of two characteristics, two groups, is the historical factors and then kind of the circumstance-specific, the time of night and the location. And I would point the court, regarding kind of the setting factors, recommend the court, Government's Exhibit 1, we can see that this is a main street through Sioux Falls. People are driving up and down. So I think that the setting is not particularized to the individuals in this car, that it's a Saturday night, it's Labor Day weekend. That encompasses a broad swath of legal activity. But there is some individualized stuff. He has gang tattoos. There's other known felons in the car. I know that's somewhat guilt by association. And he had a criminal history. I don't know. It seems like there are some individualized factors to go along with those general factors. Yes, Your Honor. And that's the second group of factors, is these historical factors. And the government hasn't identified a reason to connect those historical factors to what is going on that evening. Take the shooting, for example. The government hasn't identified, the evidence isn't in the record, that there's any similarity in circumstances between those incidents. That the lead shooting was late at night or from a car or from those people. And, Your Honor, just because my client has a prior felony, I don't believe that he carries a cloud of reasonable suspicion over his head for the rest of his life. So I think under these circumstances, the government would have to tie those factors, make them particular to this evening, to show there's a specific and particular reason to believe that crime was ongoing that night. With that, I would ask to reserve the remainder of my time. Very well. Good morning. May it please the Court, Counsel. My name is Catherine Rich from the District of South Dakota. We're asking this Court to affirm the denial of the motion to suppress in this case. Judge Strauss, to your point, our position is that there was reasonable suspicion, essentially from the beginning. What the officers, very experienced officers in this situation, knew at the time that they made this stop already heavily lent to reasonable suspicion. The time of day being about 1230. Reasonable suspicion of what? That the occupants of this car, specifically the defendant, Mr. Homden, were up to no good.  Yeah, I mean, is that good enough in our case law? Doesn't it have to be linked to a suspicion of, hey, this is high drugs, we've seen some drug deals recently, or things like that. I mean, I think what you've described is accurate, and I think that's why Judge Schreier said this is close, or I forget how the District Court described it, but is that what it comes down to, that the cops had a sense this guy was up to no good? Actually, it was Judge Duffy, the magistrate, who said it was close. Okay. The District Court didn't have the same concerns. All right, I got my judges confused. The officers here, essentially, they had that particularized and objective basis for suspecting legal wrongdoing. They knew at the time that they ran the car, the plates, that it had come back to Mr. Homden, and Officer Leekrath knew immediately recognized that name. And then at the time that he's in the vehicle, or by the vehicle, and sees who's in the back seat, he recognizes now also Habib Abdul-Qadir in the back seat. And then he recognizes the third person, the cousin who drives by. So the fact that all of that happens within the course of three minutes, that he recognizes three parolees, all of whom have a history of weapons possession. And just to ask, what's the standard here? Do you have to have reasonable suspicion of a particular crime? Like, I know he's selling meth. Or is it that a crime might be afoot? The case law from this court just says that it's legal wrongdoing, legal wrongdoing. And here, the district court relied on, there was a, the particulars that the district court said was that this person on parole, a felon, could be or likely in possession of a firearm. Being on parole, a person is more likely to engage in felonious behavior than someone who's never been convicted of a crime before. But also, Detective Mayberry testified at the suppression hearing, and his questions show throughout his body cam, his questions to the driver, that he was investigating and looking into whether or not Mr. Hamden was in violation of his parole. It came up on the records check that he had a curfew and he was not supposed to be drinking. And within 42 seconds of the stop, the driver says, we're headed downtown. And, I mean, 42 seconds, she volunteers that. Where are you going? We're going downtown. I mean, what happens downtown to who falls at 1230 on a Saturday night? I mean, it's, you're drinking. So he was immediately suspicious of that, and the record supports that. What about the six-month-old shooting? It seems like that's very, he testified to it, but they're not in any of the, this shooting is not in, he's not mentioned in any of the reports. So it seems like, I mean, if I'm being skeptical or cynical here, did the cop make it up? I mean, like, oh, I remember he was part of the shooting. Well, they found, the district court found the officers credible. But I think that's the value in street crimes units, right, is that they are familiar with these people. That's the value in Officer Leecroft having recognized these three, is they know in their town, even a town as large as Sioux Falls, what kinds of things need to be looking for. And that's the deference that officers in these types of units under this court's case law deserve, that they are trained to identify and take significance from things that maybe the average person wouldn't take significance from. I want to ask you about your views on the unreasonably prolonged argument. As I heard your colleague say that it was around 1231 where the, quote, unquote, problematic questions from Officer Mayberry started, or those that were not directly related to the traffic stop, and that it was about that time that the other officer, whose name is escaping me. Leecroft. Leecroft started the ID check with the occupants of the car. Is that your understanding of kind of the timing there? Well, roughly. But the problem with that is that you have to kind of overlay what the officers are doing. I know. And recognizing that they don't necessarily know. I mean, they can see each other, but they don't know verbally. Like, Mayberry doesn't know what Leecroft has. Right. And he also- But did that happen about the same time? Because that would alleviate some of the concerns if you believe that, you know, the second officer, Leecroft, had a legitimate investigatory purpose starting at 1231, that might help you. So the timing is that Officer Leecroft gets the passengers' IDs starting around 1230, which is less than two minutes into the stop he's collecting them. And then you can hear on the audio that dispatches, you can hear, and he waits for a break in dispatch. And so at 3156 is when he starts to have them run. And because of that, it takes like a minute and a half just to provide the information to dispatch. So at that time, what's happening with Officer Mayberry, with the driver, is I overlaid all the times in my notes. He is still at that point, not yet updated the driver's phone number. He had not yet even asked who else was in the car. Like the driver had not even identified who the backseat passengers were. So he was still very much in the stage of running the information, doing the updates. And you can see in Exhibit 2, Officer Mayberry's body cam, that there's times where you can see him. The screen is scrolling. And so the context is important. The magistrate's report and recommendation focus just on the questions and the answers. And the problem with that is that it takes out the context and the fact that he was doing two things at once. He's trying to engage in this sort of conversation with the driver. And while he's doing that, he's also trying to go through the screens and verify if what she's telling him is true, while updating this information. And you can see that as he's typing and moving around. And so the other point I wanted to bring up is the defense has suggested that LeCraft should have asked Mayberry to run because they hadn't heard back from dispatch yet. And when you look at the timing, he finishes calling in to dispatch the information at about 12.33 and 56 seconds. Well, the dispatch comes back at 12.39 a.m. And so it's about six minutes. Well, that would have caused an interruption of what Officer Mayberry was doing. And so that would have also slowed down the situation. That's like asking to decide which line you should get in at TSA is going to be fastest. Do you wait for dispatch or do you try to run it in there? Do you interrupt your colleague? So that's just not a very workable suggestion in these situations. From the state's perspective, we've got two routes here. We've got no unlawful extension. We've got reasonable suspicion from the beginning. Which do you think is the more straightforward path here? I mean, obviously the state is arguing both, so they believe both paths. But do you think there's one that's more straightforward than the other? Well, I think no unreasonable extension is the more workable when trying to offer a standard that officers— like what are officers supposed to take from any of these decisions on unreasonable extension? And under Rodriguez, you know, they have to be diligent in what they're doing. And so I think here saying it wasn't a reasonably extended sort of shows that the actions that they took were reasonable under the circumstances of these facts here. And you would say on the questions, because I have to say the questions to the driver were a little off, like the beaten path. Like they went pretty far off the beaten path. What do we do with that? You just say, in your view, you would say that because they were running the criminal histories with dispatch, they could do that. They could ask whatever questions they wanted during that period. Well, I mean, I think that's true, yes. But also, I don't think they were that far off the beaten path in that they knew he was on parole. And yet—and it's his car, yet when they walk up, he's not the driver. Yeah. And they were both familiar that there's the parole conditions. So what is he doing in parole? So a lot of these questions regarding that are very much like, is this guy—do we need to arrest this guy for being in violation of his parole conditions? The hard part is when I say off the beaten path, it gets at the reasonable suspicion, right? Because they're asking questions of the driver and saying, hey, isn't that guy pretty suspicious, right? And so they kind of merge together to some degree. Well, and I think that's why the context of what the officer was doing is particularly relevant here. Because he's also trying to assess this driver's credibility, which it turns out she wasn't very credible. So that's—they need to be able to do that in order to complete their jobs. So the other thing I just wanted to touch on is that the running—oh, I'm sorry. My time is up. Well, we would ask that you affirm. Thank you. Thank you. Ms. Carter, we'll give you a minute. Your Honors, I want to start with something Judge Kobus noted, is it is clearly not sufficient for these officers to believe that these individuals are up to no good. But we don't require a specific criminal offense that they're—to Judge Strass' question, right? I mean, that's correct. Yes, Your Honor. The cases have said legal wrongdoing or that crime is afoot, which we submit that there wasn't here. And going to something that—you look like you have a question.  Going to something that the government said that Officer Lee Craft shouldn't be required to interrupt Officer Mayberry while he's interviewing this driver, the fact is that he did, in fact, interrupt Officer Mayberry with the search of this individual who was not there. And at that point, if he's going to do that interruption, that needs to be particularized to the purpose of this stop. I can see that my time is up. So for those reasons, we would ask that you reverse the denial of the motion to suppress. Thank you. Thank you. Thanks to both counsel for the argument and briefing. Case is submitted. We'll issue an opinion in due course. Thank you, Your Honor. You may be dismissed.